UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
CENTRAL DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | * | CR 10-30057-RAL |
| | * | |
| Plaintiff, | * | |
| | * | |
| vs. | * | OPINION AND ORDER |
| | * | ADOPTING IN PART AND |
| ROBERT MEDEARIS, | * | DENYING IN PART REPORT |
| | * | AND RECOMMENDATION |
| Defendant. | * | AND GRANTING IN PART AND |
| | * | DENYING IN PART MOTION |
| | * | TO SUPPRESS |
| | * | |

## I. INTRODUCTION

This case originated with a motor vehicle accident on the Rosebud Sioux Tribe reservation in which a young Native American child suffered severe injuries. At the accident scene, India Ford was intoxicated, claimed that she was the driver, and thus was arrested. Tribal police suspected that Patrick Medearis ("Patrick") was the actual driver of the vehicle and that Patrick attempted to conceal this fact from police because Patrick was on federal supervised release. One of the investigating officers, Rosebud Sioux Tribe Special Agent Charles Ginsbach, sought and obtained a search warrant from Tribal Judge Janel Sully for the vehicle, which had been towed after the accident to the residence of Defendant Robert Medearis ("Medearis"). Upon discovering that the front windshield had been removed from the vehicle, Agent Ginsbach phoned Judge Sully, who verbally authorized the search of Medearis's property for the missing windshield. Police then found the windshield on the premises.

After being indicted for tampering with evidence, Medearis moved to suppress (Doc. 16) the windshield and other physical evidence as well as all statements he made to tribal officers

-1-

and an FBI agent.  After the parties fully briefed the motion, Magistrate Judge Mark Moreno held

a hearing on the motion on October 6, 2010.  On October 20, 2010, Judge Moreno issued a

Report and Recommendation (Doc. 30), recommending that Medearis's motion to suppress be

denied.

Copies of the Report and Recommendation were served upon the parties as required by 28

U.S.C. § 636.  In considering a magistrate judge's recommendation on a dispositive matter, such

as a motion to suppress evidence, a district court must make a "de novo determination of those

portions of the report or . . . recommendations to which objection is made." 28 U.S.C. § 636(b)(1).

Medearis filed objections (Doc. 35) to the Report and Recommendation on November 2, 2010.

This Court has conducted a de novo review of the record .  For the reasons explained below, the

Court adopts in part and declines in part the Report and Recommendation.

## II.  FACTS[1]

On January 31, 2010, a four-year-old child suffered severe injuries in a motor vehicle

accident near Wood, South Dakota.  T. at 7.  According to the Affidavit for Search Warrant of

Agent Ginsbach, the child's mother, India Ford, told Rosebud Police Highway Safety Officer

Frank Iron Heart that she was the driver of the pickup truck involved.  Ex. 1.  Tribal

investigators, however, based on information they had received, suspected that Ford's boyfriend,

Patrick Medearis, was the actual driver.  After the accident, the pickup, registered to Defendant

Robert Medearis, was towed and left at his residence.  Because Ford lacerated her forehead

during the accident, Agent Ginsbach wished to have the windshield tested for DNA in order to

---

[1]Any references to the suppression hearing transcript will be "T" followed by the page
number or numbers.

assist in identifying the driver of the pickup during the accident.  T. at 7-8.

On February 2, 2010, Agent Ginsbach applied for a warrant to search and seize the pickup from the property.  Agent Ginsbach submitted a supporting affidavit in which he stated that the front windshield of the pickup possibly had DNA evidence that would show whether Ford was the driver at the time of the accident.  Ex. 1.  Rosebud Sioux Tribal Judge Janel Sully issued a warrant authorizing tribal police to search Medearis's property for the pickup.  Ex. 2.

While executing the warrant, Agent Ginsbach discovered that the windshield had been removed from the pickup.  He noticed an ax and pick hammer nearby and glass shards on the dash and hood of the pickup.  Agent Ginsbach surmised that the windshield recently had been chopped out of the truck's frame.

Upon seeing this, Agent Ginsbach presented the search warrant to Defendant Robert Medearis and asked Medearis about the location of the windshield.  Medearis initially answered that he had thrown it away in a dumpster by the high school and then said that he had sold it.  T. 46; 89-90.  When Agent Ginsbach stated that he would apply for another search warrant, Medearis said "go ahead," and he drove to the back of his residence.  T. 23.

Fearing that the windshield, and therefore any DNA evidence on it, might be inside the residence and either tampered with or destroyed, Agent Ginsbach ordered three of his fellow officers to enter the residence and secure its occupants.  As the officers did so, Agent Ginsbach telephoned Judge Sully and requested authorization to expand the scope of the original search warrant.  Agent Ginsbach was not experienced with seeking a telephonic search warrant or the specific rules governing a telephonic search warrant application, but he was aware through his training that such warrants had been authorized in the past.  T. 64.  According to his training,

Agent Ginsbach was "to call the judge, notify him or her of your circumstances, request a telephonic search warrant of whatever you want to search and if they grant it, then do the search and then within a reasonable amount of time, submit an affidavit and the typed warrant to search before them and have them sign it." T. 65. Agent Ginsbach testified that he was never taught that the telephone call needed to be recorded or under oath. Id. This training did not strictly comport to the BIA-Office of Justice Services "Law Enforcement Handbook," Ex. 5. Judge Sully granted Agent Ginsbach's request and issued a telephonic warrant to search Medearis's residence and property for the missing windshield. It was the "second or third" telephonic search warrant request authorized by Judge Sully during her tenure as tribal judge. T. 79. Judge Sully testified that, because the Rosebud Sioux Tribal Law and Order Code does not address telephonic search warrants, tribal judges look to the Federal Rules of Criminal Procedure for guidance. T 83-84.

After completing the call with Judge Sully, Agent Ginsbach entered the residence where Robert Medearis, his son Patrick, and India Ford were detained. The occupants "were being secured so they wouldn't destroy any evidence until [Agent Ginsbach] found it." T 50. Agent Ginsbach testified that Defendant Robert Medearis would not have been free to leave and "remained detained from the point that [Agent Ginsbach] ordered the police to enter the house . . . through the time until [Agent Ginsbach] located the windshield." T. 48-50. Without advisement of Miranda rights, Agent Ginsbach informed Medearis that he had received authorization to search the premises and asked Medearis a second time for the location of the windshield. Medearis again said that he had sold it. T. 46. Agent Ginsbach proceeded outside and located the windshield in an old truck bed on the side of the residence. He photographed and

-4-

seized the windshield, the pickup from which it had been taken, and the ax and hammer.  He then arrested Medearis for tampering with evidence.

The next day, February 3, 2010, Special Agent Ginsbach and FBI Agent David Keith spoke briefly with Medearis about the pickup.  T. 100.  Medearis approached the agents after they concluded an interview with Patrick.  T. 100.  Their conversation occurred outside Medearis's residence following his release from tribal custody on the tampering charge. Medearis asked questions concerning recovering possession of the pickup seized the previous day.  T. 101.  While speaking with the agents, Medearis said "that he had cut the windshield out of the pickup truck to access the wiring harness from underneath the dash" because he had a buyer interested in certain parts of the pickup.  T. 101-04.

On February 12, 2010, ten days after the search and seizure occurred, Agent Ginsbach executed, under oath, a supplemental search warrant affidavit before Rosebud Sioux Tribal Judge Steve Emery.  The second warrant was intended to memorialize the telephonic search warrant that Judge Sully had issued on February 2, 2010, on which she previously had briefed Judge Emery.  Judge Emery also signed, on February 12, 2010, two search warrant returns, one for the original warrant that Judge Sully had issued and the other for the telephonic warrant that she had later authorized.  Judge Emery signed the documents because Judge Sully was unavailable on February 12, 2010, which was the date that Agent Ginsbach understood to be the deadline for a judge to sign the documentation.

## III.  DISCUSSION

It is undisputed that Agent Ginsbach and Judge Sully failed to comply with certain provisions of Rule 41 of the Federal Rules of Criminal Procedure relating to the issuance,

execution, and return of telephonic search warrants.  In order to determine whether the lack of

statutory compliance justifies suppression of evidence, this Court must address various disputed

legal questions.

**A.  Whether Agent Ginsbach was a Federal Officer**

Medearis objects to the Magistrate Judge's finding that Rule 41 does not apply because

the telephonic warrant was issued by a tribal judge and was sought and executed by tribal - not

federal - law enforcement officers.  Medearis objects to this finding on the basis that Agent

Ginsbach, in addition to serving as a tribal law enforcement officer, is a federal law enforcement

officer or was acting as a federal law enforcement officer during the search in controversy.

During the suppression hearing, Agent Ginsbach testified that he became a special agent after

completing training at a federal law enforcement training center, and he is employed as a law

enforcement officer by the Tribe under a "638 contract"[2] between the Tribe and the Bureau of

---

[2]A "638 contract" is an agreement entered into under the Indian Self-Determination Act
of 1975 under which a tribe agrees to provide various law enforcement services on a reservation.
Prior to 1976, the Department of Interior's Bureau of Indian Affairs was the primary provider of
law enforcement services on various reservations.  The agreements are commonly referred to as
"638 contracts" because of the public law number of the 1975 Act.  See United States v.
Schrader, 10 F.3d 1345, 1350 (8th Cir. 1993); 25 U.S.C. § 450h.

Under 25 U.S.C. § 2802(a), the Secretary of the Interior ("Secretary"), through the BIA, is
responsible for providing or assisting in providing law enforcement services in Indian Country.
See United States v. Roy, 408 F.3d 484, 489 (8th Cir. 2005); United States v. Antoine, No. 08-
30004-01-KES (D.S.D. June 4, 2008); see also Schrader, 10 F.3d at 1350; 25 U.S.C. § 450h.  To
fulfill this obligation, the "'Secretary may enter into an agreement for the use . . . of the personnel
or facilities of a Federal, tribal, State, or other government agency' to assist in the provision of
law enforcement services in Indian Country."  Id. (quoting 25 U.S.C. § 2804(a)).  When acting
under the authority of a 638 contract, "a person who is not otherwise a Federal employee shall be
considered to be an employee of the Department of the Interior" for certain purposes.  Id.
(internal citation omitted).

Indian Affairs ("BIA").  T. at 6, 106.  As a result, Medearis contends that the telephonic search warrant Ginsbach obtained needed to comply with the requirements of the Federal Rules of Criminal Procedure, specifically Rule 41.

Tribal officers are deemed federal officers for certain purposes when either cross-deputized or employed through a contract with the BIA.  See United States v. Schiradelly, 617 F.3d 979, 981 (8th Cir. 2010) (finding that tribal officers employed through a contract with the BIA constituted federal officers for purposes of assault on a federal officer charge under 18 U.S.C. § 111); United States v. Schrader, 10 F.3d 1345, 1350 (8th Cir. 1993) (tribal officers can act as federal officers under authorized contracts with the Department of Interior).  In 1990, Congress passed the Indian Law Enforcement Reform Act, 25 U.S.C. §§ 2801-09, "to clarify and strengthen the authority of the law enforcement personnel and functions within the [BIA]."  Schrader, 10 F.3d at 1350 (quoting S. Rep. No. 167, 101st Cong., 2d Sess. 4 (1990), reprinted in 1990 U.S.C.C.A.N. 712, 712).  Under that Act, the Secretary of Interior may charge BIA employees with a broad range of law enforcement powers, including contracting with a tribe to assist the BIA in enforcing tribal laws and, in connection with such a contract, authorize a tribal law enforcement officer "to perform any activity the Secretary may authorize under section 2803."  Id. (quoting 25. U.S.C. § 2804(a)).  When acting under such authority, "a person *who is not otherwise a Federal employee* shall be considered to be an employee of the Department of the Interior *only for purposes of* . . . sections 111 [Assault, Resisting, or Impeding Certain Officers] and 1114 [homicide against federal officers] of Title 18," eligibility for certain benefits under 5 U.S.C. § § 8191 *et seq.*, or state or local employees assigned to a federal agency under 5 U.S.C. § 3374.  Id. (quoting 25 U.S.C. § 2804(f)) (emphasis added).  Tribal officers deputized

-7-

to perform federal functions - even without a 638 contract - also have been deemed federal officers for these purposes when performing the federal functions for which they were deputized. See United States v. Oakie, 12 F.3d 1436, 1440 (8th Cir. 1993); see also United States v. Martin, 163 F.3d 1212, 1215 (10th Cir. 1998).

The fact that a tribal officer receives BIA deputization under a 638 contract does not necessarily make him a federal officer.  See Head v. United States, 2010 U.S. Dist. LEXIS 21356, No. 07-3555 at *4-5 (D. Minn. March 9, 2010) (finding that tribal officer with BIA certification was not acting as federal officer when suspect was arrested on tribal charges, held in a tribal jail with bail set by a tribal officer, and then appeared before a tribal judge to review the bail decision).  In addition to receiving a certification from the BIA that the tribal officer is capable of enforcing federal law on a reservation:

> the tribal officer must be enforcing federal law vis-a-vis tribal law.  Thus, even assuming that the federal officers are certified, be they BIA, whether the officers were acting under color of federal law depends entirely on what law was being enforced, which means the facts in each case must be analyzed.

Id. at *5.

Because none of the specific purposes for deeming a tribal officer to be a federal officer apply in this case, Agent Ginsbach is not deemed a federal officer.  The warrants sought and executed in this case were tribal, not federal, warrants.  The warrants issued expressly concerned an investigation into possible violations of the Tribe's laws proscribing False Alarms, Tampering with a Witness, and Driving under the Influence.  Ex. 2; Ex. 4.  Under these circumstances, "tribal police are not federal officers unless there is a 'working arrangement' in which the federal officers use the tribal officers as a means of skirting a criminal defendant's procedural protections."  Gallegos, 2003 U.S. App. LEXIS 24235, at *12; see also United States v. Mitchell,

502 F.3d 931, 961-62 (9th Cir. 2007) (finding that defendant failed to show "actual collaboration" intended to deprive him of federal procedural rights when agents did not discuss the difference in rights afforded to those in federal and tribal custody, even though the federal officers concluded there was insufficient evidence to obtain federal search or arrest warrants while tribal officers concluded there was sufficient evidence to obtain tribal arrest warrants.).

Therefore, this Court overrules Medearis's objection to the Report and Recommendation concerning Agent Ginsbach's status. Agent Ginsbach was acting as a tribal officer, not as a federal officer, when obtaining and executing search warrants issued in writing and by telephone from the tribal judge and when conducting his investigation. Agent Ginsbach's investigation was not federal in character, as neither FBI Agent Keith nor any other federal agents were involved in the warrant application process or the search itself. Therefore, the procedural requirements of Rule 41 do not apply to this case. See United States v. Cote, 569 F.3d 391, 393 (8th Cir. 2009) ("Rule 41 applies only where a warrant is sought by a federal law enforcement officer or where the search can otherwise be characterized as federal in character.") (quoting United States v. Jones, 471 F.3d 868, 871 (8th Cir. 2006)); United States v. Hornbeck, 118 F.3d 615, 617-18 & n.4 (8th Cir. 1997) ("Rule 41 does not apply here because federal authorities were not involved in applying for or executing the warrant."); United States v. MacConnell, 868 F.2d 281, 283-84 (8th Cir. 1989).

## B. Constitutionality of the Search and Questioning

### 1. Good-Faith Exception to the Warrant Requirement

Medearis objects to the Magistrate Judge's finding and recommendation that the search resulting in seizure of the windshield was constitutional under the good-faith exception to the

warrant requirement as outlined in United States v. Leon, 468 U.S. 897 (1984). Medearis argues that the good-faith exception does not apply in this case to cure what he contends was an illegal search and seizure.

The Fourth Amendment provides the standard for determining whether the windshield and other evidence seized by tribal officers is admissible in this federal criminal proceeding. See United States v. Cote, 569 F.3d at 393; United States v. Hornbeck, 118 F.3d at 617; United States v. MacConnell, 868 F.2d at 284. The Warrant Clause of the Fourth Amendment requires that warrants (1) be issued by a neutral and detached judge; (2) contain a "particular[] description of the place to be searched, and the persons or things to be seized"; and (3) be based "upon probable cause, supported by Oath or affirmation." Dalia v. United States, 441 U.S. 238, 255 (1979); U.S. Const amend. IV.

This Court finds, and Medearis does not dispute, that all three requirements of the Warrants Clause were satisfied with respect to the initial search warrant. First, Judge Sully acted as a neutral and detached judge in issuing the initial warrant. Second, the warrant contained a sufficiently detailed description of Medearis's residence and property and of the pickup to be seized. Third, under the standard established by the Supreme Court of the United States, probable cause existed. See Illinois v. Gates, 462 U.S. 213, 238-39 (1983).

Medearis argues that the further search of his residence and curtilage, based on the telephonic warrant issued by Judge Sully, violated one or more of the requirements of the Warrants Clause. According to Medearis, tribal officers acted beyond the scope of the original warrant when photographing the windshield and seizing it, as well as when seizing the ax and hammer. Medearis also contends that Judge Sully's telephonic authorization, based on Agent

-10-

Ginsbach's disclosures made after issuance of the original warrant, did not validate these seizures.

At the suppression hearing, Judge Sully testified that the information conveyed to her by Agent Ginsbach during their telephone conversation was not under oath. Consequently, because a warrant cannot be based solely on unsworn statements, something more than Agent Ginsbach's verbal update was required to support the issuance of the telephonic search warrant. Frazier v. Roberts, 441 F.2d 1224, 1226-29 (8th Cir. 1971). Given the facts and circumstances of this case, it is arguable that either the original warrant or the original warrant combined with Agent Ginsbach's unsworn statements satisfies the requirements of the Warrants Clause for search and seizure of the apparently recently severed windshield.[3] This Court, however, need not decide that issue because the "good faith exception" to the warrant requirement validates the search and seizure in controversy. See United States v. Leon, 468 U.S. 897 (1984).

---

[3]Defendant objected to this reasoning in the Report and Recommendation, contending that "[e]ven [Agent] Ginsbach testified that he needed another warrant in order to search for and seize the removed windshield." (Doc. 35, at 5). However, Agent Ginsbach's testimony was somewhat different. In response to questioning concerning whether the warrant authorized seizing property on the premises generally in addition to components of the pickup, Agent Ginsbach agreed that he "needed to have further authorization or a second warrant." T. 69. Such further authorization might have referred to an expansion of the initial warrant.

The windshield was located on the premises at which the warrant specifically authorized a search, and although the windshield was not found where it would have been expected - affixed to the pickup - a search need not be limited to those places where the items sought "normally are stored." People v. Kraft, 23 Cal. 4th 978, 1043, 99 Cal. Rptr. 2d 1, 44, 5 P.3d 68, 107 (Cal. 2000) (thus, search warrant authorizing for photos permitted search under floor mats of car). To find the recently severed windshield, Agent Ginsbach "merely looked in a spot where the specified evidence of crime plausibly could be found." Id. The evidence presented at the suppression hearing - the presence of glass shards on the dash and hood of the pickup and an ax and pick hammer nearby - indicated that the windshield had been removed from the pickup after it was towed to the Medearis residence following the vehicle accident. Under such circumstances, the first warrant arguably authorized law enforcement to search the remainder of the premises, particularly the curtilage, for the severed portion of the vehicle.

In <u>Leon</u>, the Supreme Court articulated a good-faith exception to the Exclusionary Rule. <u>Id.</u> at 922.  Under the exception, the Exclusionary Rule is not to "be applied to exclude the use of evidence obtained by the officers acting in reasonable reliance on a detached and neutral magistrate judge's determination of probable cause in the issuance of a search warrant that is ultimately found to be invalid."  <u>United States v. Taylor</u>, 119 F.3d 625, 629 (8th Cir. 1997) (citing <u>Leon</u>, 468 U.S. at 905, 922); <u>see also</u> <u>United States v. Gipp</u>, 147 F.3d 680, 688 (8th Cir. 1998) (applying the <u>Leon</u> good-faith exception to a tribal search warrant).  The Supreme Court explained the rationale behind the good-faith exception in this manner:

> It is the magistrate's responsibility to determine whether the officer's allegations establish probable cause and, if so, to issue a warrant comporting in form with the requirements of the Fourth Amendment.  In this ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination or his judgment that the form of the warrant is technically sufficient.  "[O]nce the warrant issues, there is literally nothing more the policeman can do in seeking to comply with the law."  Penalizing the officer for the magistrate's error, rather than his own, cannot logically contribute to the deterrence of Fourth Amendment violations.

<u>Leon</u>, 468 U.S. at 921 (alteration in original) (citation omitted).

"The Exclusionary Rule is designed to deter misconduct rather than to punish the errors of judges and magistrates."  <u>Id.</u> at 926.  The good-faith exception does not exclude evidence when an officer's reliance on a warrant issued by a judge or magistrate is objectively reasonable. <u>Id.</u> at 922.  An officer's reliance is not objectively reasonable, and the good-faith exception, therefore, does not apply, in the following four circumstances:  (1) When the issuing judge is misled by information that is false or made in reckless disregard for the truth;  (2) When the issuing judge completely abandons her judicial role; (3) When the information provided to the judge includes so little indicia of probable cause that the officer's belief in its existence is entirely

-12-

unreasonable; and (4) When the warrant is so facially deficient, i.e., in failing to particularize the place to be searched or the things to be seized, that the executing officer cannot reasonably presume it to be valid.  Id. at 923; see also United States v. Hessman, 369 F.3d 1016, 1020 (8th Cir. 2004) (noting these four situations).

Agent Ginsbach's reliance on Judge Sully's issuance of an oral warrant by telephone was objectively reasonable under the circumstances, and none of the four disqualifying conditions precedent exist in this case.  None of Agent Ginsbach's sworn or unsworn statements contained either known or reckless falsities.  Indeed, Medearis does not claim otherwise or assert that any of the information that Agent Ginsbach supplied to Judge Sully was inaccurate.  No evidence suggests that Judge Sully abandoned her judicial role in any way, such as by failing to act in a neutral and detached manner, acting as a mere rubber stamp, engaging in the "competitive enterprise of ferreting out crime,"  see Johnson v. United States, 333 U.S. 10, 14 (1948), or blindly approving the telephonic warrant.  Given that information from an undisputedly valid warrant comprised the majority of the factual foundation for issuance of the telephonic warrant, the information provided to Judge Sully contained more than sufficient indicia of probable cause that Agent Ginsbach's belief in its existence was not entirely unreasonable.  In fact, the content of the February 2, 2010 affidavit and oral statements supplementing the initial warrant was more detailed than that provided in Leon.  Finally, the telephonic warrant was not facially deficient. It was a follow-up to the initial warrant, which contained a particularized description of the place

to be searched - the property of Robert Medearis, including the address - and the things to be seized, i.e. the pickup, including the year, color, make, model, and license plate number. Ex. 2. The first warrant authorized Agent Ginsbach to "make a search of the premises described above, for the described property and person, and of the same or any part thereof be found." Id. The telephonic warrant further particularized the thing to be seized as the windshield of the vehicle for which a valid warrant already existed.

As a result, Agent Ginsbach's reliance on the warrant was in good faith. He reasonably believed that he had a valid telephonic warrant, or at least court-approved authority, to search for and seize the windshield and related evidence. Nothing in either the Rosebud Sioux Tribe Law and Order Code or the BIA Law Enforcement Handbook used by the Rosebud Police Department in connection with its "638 contract" would have made a reasonable tribal officer, in his position, conclude otherwise. Judge Sully testified that Agent Ginsbach's telephonic request was a continuation of an earlier request he made, which had been granted, and sought to include the search and seizure of property that had previously been approved, i.e. the vehicle, of which the windshield was a standard appurtenance.[4] The affidavit underlying the initial warrant described observation of the windshield having been attached to the vehicle at the time of the

---

[4]Authority in another jurisdiction has held that it was unnecessary for a police officer to have an oath administered in proceeding to issue a search warrant where the officer previously had appeared before the judge to issue the same warrant but had been unable to perform the search. See State v. Nunez, 138 Idaho 636, 641 67 P.3d 831, 836 (2003). In Nunez, the judge issuing the warrant treated the second proceeding as a continuation of the initial warrant, for which the officer simply provided up-to-date information to support his previous testimony. Id.

accident, containing "a hole in it where someone's head smashed into it at the time of the accident," and "hold[ing] DNA evidence" relevant to the investigation.  Ex. 1.  The original warrant in this case allowed for the search and seizure of a particular truck, which included all other component parts ordinarily affixed to such a vehicle.  Among these parts included a windshield.

The Eighth Circuit has applied the Leon good-faith exception in circumstances similar to those in this case.  In United States v. Hessman, a search warrant was issued by telephone and facsimile.  369 F.3d 1016 (8th Cir. 2004).  The officer had not signed the warrant application, and the magistrate did not place the officer under oath or talk to the officer about the facts supporting the application before signing the warrant and faxing it back to the officer for execution.  The Eighth Circuit held that the good-faith exception applied.  Id. at 1018-23.  Other courts confronting analogous situations also have applied the exception.  See e.g., United States v. Callwood, 66 F.3d 1110, 1113 (10th Cir. 1995) (ruling that the exclusion of evidence is not the "appropriate remedy" for the issuing magistrate judge's failure to administer an oath to the officer, referring to Leon); United States v. Gordon, No. 93-3836, 1995 WL 108988,  at *4 (6th Cir. 1995) (relying on Leon and refusing to suppress contraband seized by police where the warrant that the defendant was arrested on was based on an unsworn and deficient affidavit); United States v. Kurt, 986 F.2d 309, 311 (9th Cir. 1993) (applying the good-faith exception where a judge instructed the detective to change an address on the warrant without administering

an oath); United States v. Moore, 968 F.2d 216, 223 (2nd Cir. 1992) (holding that "the lack of an oath or affirmation by the presiding officer did not destroy the warrant's facial validity" and, therefore, Leon applied); United States v. Richardson, 943 F.2d 547, 548, 550-51 (5th Cir. 1991) (reversing the district court's decision to suppress where the agent had not signed the affidavit and the magistrate judge, in a telephone conversation, did not require an oath or affirmation of the facts in the affidavit); United States v. Matias, 836 F.2d 744, 747 (2nd Cir. 1988) (rejecting a claim that a warrant was invalid because government agents applying for the warrant were not placed under oath or formally sworn); United States v. Johnson, No. 8:08CR234, 2009 WL 483233, at *1 (D. Neb. Feb. 23, 2009) (concluding that a warrant issued without the applicant officer being sworn did not, based on Leon, require suppression under the Exclusionary Rule); United States v. Henderson, No. CR. 05-0078, 2005 WL 3021982, at *5 (N.D. Iowa Nov. 10, 2005) (finding that even if the officer had not been placed under oath, the Leon good-faith exception to the Exclusionary Rule applied), report and recommendation adopted at 2005 WL 3263912, aff'd at 471 F.3d 935 (8th Cir. 2006); Mills v. Graves, 930 F.2d 729, 734 (9th Cir. 1991) (upholding a telephonic search warrant despite the fact that the officer's oath was taken five days later).

Courts, likewise, have applied the Leon exception in cases where the issuing judge neglected to record, transcribe, and certify the officer's oral statements. See e.g., Cote, 569 F.3d at 392; United States v. Chaar, 137 F.3d 359, 362-64 (6th Cir. 1998) (police officer's reliance on

telephonic warrant was in good faith and objectively reasonable even though the warrant did not comply with Rule 41's recording and transcription requirements); United States v. Clyburn, 24 F.3d 613, 617 (4th Cir. 1994) (Fourth Amendment does not require that statements made in support of probable cause be tape recorded or otherwise placed on the record or made a part of the search warrant affidavit).  The exception also has been applied when other technical, non-fundamental errors occurred in the warrant process.  See Hessman, 369 F.3d at 1019-23; United States v. Berry, 113 F.3d 121, 123-24 (8th Cir. 1997); United States v. Freeman, 897 F.2d 346, 348-50 (8th Cir. 1990); see also Hornbeck, 118 F.3d at 617-18 (failure to timely file return and provide defendant with inventory of property seized, in violation of tribal law, did not require suppression); United States v. Rome, 809 F.2d 665, 668-71 (10th Cir. 1987) (suppression of evidence obtained from a search warrant, issued in violation of Rule 41, would not serve the "remedial objectives" of the Exclusionary Rule, as approved by Leon).

Persuaded by Leon and precedent in this and other circuits, this Court concludes that the physical evidence obtained from Medearis's property should not be suppressed.  Agent Ginsbach's conduct was objectively reasonable.  Agent Ginsbach did not attempt to avoid complying with the telephonic warrant requirements or act with reckless disregard of them.  "The Exclusionary Rule's deterrent purpose would not be served by penalizing the officer for the judge's mistake, because the rare occasion when a magistrate accidentally fails to administer an oath cannot be eliminated by suppressing the evidence in that situation."  Hessman, 369 F.3d

at 1021 (citing <u>Leon</u>, 468 U.S. at 906); <u>see also</u> <u>Berry</u>, 113 F.3d at 123-24 (concluding that <u>Leon</u> exception applied when clerical error existed in wording of warrant); <u>Freeman</u>, 897 F.2d at 349-50; <u>Hyten</u>, 5 F.3d at 1156 n.5 (noting that nothing in record implied bad faith by officers and that the officer "could easily have personally signed the affidavit if the judge had so permitted."); <u>United States v. Curry</u>, 911 F.2d 72, 77-78 (8th Cir. 1990) (affirming district court determination that <u>Leon</u> exception applied when officer's "failure to completely fill out the warrant form was more a clerical error than an indication of bad faith.").  The judge is the final reviewing official who "must shoulder the ultimate responsibility for procedural errors in a warrant application process." <u>Berry</u>, 113 F.3d at 124.  Officers such as Agent Ginsbach "are not ordinarily expected to question a [judge's] judgment as to a warrant's technical sufficiency." <u>United States v. Hyten</u>, 5 F.3d 1154, 1156 n.5 (8th Cir. 1993).

Agent Ginsbach communicated with Judge Sully by telephone so that she could consider a second warrant and Judge Sully could have administered an oath to Agent Ginsbach, but she did not.  His non-compliance with the procedural prerequisites for the issuance of a telephonic warrant was neither intentional nor the result of bad faith.  Medearis received the benefit of a tribal judge's impartial evaluation before the search occurred.  The search was supported by probable cause and conducted in good faith.  Suppressing the evidence seized is not called for in this case.

**2.  February 2, 2010 Statements**

Medearis contends that all of his February 2, 2010 statements - while in his van before the telephone call to Judge Sully and while in the kitchen/dining area of his residence after the call to Judge Sully - to Agent Ginsbach must be suppressed.  He contends that the statements were not made voluntarily, that the statements were elicited in violation of his rights under Miranda v. Arizona, 384 U.S. 436 (1966), and that the statements were the tainted fruit of a Fourth Amendment violation.  The Court addresses these arguments in turn.

### a.  Statements Made Outside the House

#### i).  Voluntariness

Medearis first argues that the statements he made were involuntary under the Fifth Amendment.  He argues that his statements were not the product of rational intellect and free will and, therefore, must be suppressed.

Due process requires that incriminating statements or confessions be voluntary.  See Schneckloth v. Bustamonte, 412 U.S. 218, 225-26 (1973) (a voluntary confession may be used against a suspect, but an involuntary one offends due process).  The Government bears the burden of persuasion and must prove, by a preponderance of the evidence, that the challenged statements were voluntary.  Colorado v. Connelly, 479 U.S. 157, 169 (1986); see also United States v. Astello, 241 F.3d 965, 966 (8th Cir. 2001).

The test for determining voluntariness is whether the pressures exerted on the suspect have overborne his will.  United States v. Meirovitz, 918 F.2d 1376, 1379 (8th Cir. 1990)

-19-

(quoting United States v. Jorgensen, 871 F.2d 725, 729 (8th Cir. 1989)).  A statement is

voluntary if it is "the product of an essentially free and unconstrained choice by its maker."

Schneckloth, 412 U.S. at 225.  "A statement is involuntary when it [is] extracted by threats,

violence or express or implied promises sufficient to overbear the [suspect's] will and critically

impair his capacity for self-determination." United States v. LeBrun, 363 F.3d 715, 724 (8th Cir.

2004).

        This Court considers the totality of the circumstances to determine whether a statement

was made voluntarily.  Id.; see also Wilson v. Lawrence County, 260 F.3d 946, 952 (8th Cir.

2001); United States v. Reynolds, No. 09-30106-RAL, 2010 U.S. Dist. LEXIS 41814, at *8

(D.S.D. 2010).  When doing so, the Court examines "the conduct of the officer and the

characteristics of the accused." LeBrun, 363 F.3d at 724; Reynolds, 2010 U.S. Dist. LEXIS

41814, at *8.  Factors that the Court may weigh in determining whether a statement is voluntary

include the prolonged nature of the questioning, LeBrun, 363 F.3d at 726, the defendant's

subjective understanding of his Miranda rights, Simmons v. Bowersox, 235 F.3d 1124, 1133-34

(8th Cir. 2001), the age of the defendant, his lack of education, or his low intelligence, United

States v. Gallardo-Marquez, 253 F.3d 1121, 1123-24 (8th Cir. 2001), the defendant's prior

contact with law enforcement, Gallardo-Marquez, 253 F.3d at 1124, and the use of physical

punishment such as deprivation of food or sleep, Hall v. Wolff, 539 F.2d 1146, 1150-51 (8th Cir.

1976).  A statement cannot be rendered involuntary by the incapacity of the suspect alone; there

-20-

must be some coercive police activity.  Connelly, 479 U.S. at 164, 167.

The Court has carefully reviewed the record now before it with these factors in mind. In doing so, the Court has evaluated the conduct of the officers and Medearis's ability to resist pressure.  The officers engaged in no coercion, never threatened Medearis in any way, the questioning was brief, and no physical punishment was employed.  Agent Ginsbach engaged in a "regular conversation tone" and never raised his voice.  T. 22.  Medearis is an adult and was 60 years old when making the statements.  (Doc. 4).  None of Medearis's conduct, and nothing else in the record, suggests that Medearis suffered from any form of incapacity.  Considering all of the factors relevant to the voluntariness inquiry, the Government has proven by a preponderance of the evidence that Medearis's statements were voluntary.

### ii).  **Miranda Issues**

Medearis next contends that his statements were elicited in violation of his rights under Miranda.  He maintains that he was detained and questioned without any Miranda advisement.

The Fifth Amendment to the United States Constitution affords criminal suspects the right to be free from compulsory self-incrimination.  Criminal suspects must have knowledge of their Fifth Amendment rights "before they can either intelligently exercise or waive these important privileges."  United States v. Griffin, 922 F.2d 1343, 1356 (8th Cir. 1990); United States v. Running, 698 F. Supp. 2d 1186, 1191 (D.S.D. 2009).  The United States Supreme Court held in Miranda that any time a person is taken into custody for questioning they must be advised

of their Fifth Amendment rights in order "to counteract the 'inherently compelling pressures' of custodial interrogation." Arizona v. Roberson, 486 U.S. 675, 681 (1988) (quoting Miranda, 384 U.S. at 467).

The safeguards of Miranda "assure that [a suspect's] right to choose between speech and silence remains unfettered throughout the interrogation process." Connecticut v. Barrett, 479 U.S. 523, 528 (1987) (quoting Miranda, 384 U.S. at 469). The suspect has the right to "control the time at which questioning occurs, the subjects discussed, and the duration of the interrogation." Michigan v. Mosley, 423 U.S. 96, 103-04 (1975).

Miranda "requires that a warning as to the availability of the privilege against self-incrimination and to the assistance of counsel be issued *prior to questioning* whenever a suspect is (1) interrogated (2) while in custody." Griffin, 922 F.2d at 1347; see also United States v. Head, 407 F.3d 925, 928 (8th Cir. 2005). There is no dispute here that Medearis was not advised of his Miranda rights prior to the questioning on February 2, 2010.

"Interrogation" is "the direct questioning [by a law enforcement officer] or any practice reasonably likely to evoke an incriminating response from a suspect." Griffin, 922 F.2d at 1347 (quoting Rhode Island v. Innis, 446 U.S. 291, 301 (1980)). "Custody occurs when a suspect is deprived of his freedom of action in any significant manner." United States v. Axsom, 289 F.3d 496, 500 (8th Cir. 2002). The "ultimate inquiry" in the custody determination "is simply whether there [was] a formal arrest or restraint on freedom of movement of the degree associated with

-22-

a formal arrest." LeBrun, 363 F.3d at 720 (quoting <u>California v. Beheler</u>, 463 U.S. 1121, 1125

(1983)).  "Two discrete inquiries are essential to this determination:  first, what were the

circumstances surrounding the interrogation; and second, given those circumstances, would a

reasonable person have felt he or she was not at liberty to terminate the interrogation and leave."

LeBrun, 363 F.3d at 720 (quoting <u>Thompson v. Keohane</u>, 516 U.S. 99, 112 (1995)).  In making

these inquiries, a court must "look at the totality of the circumstances while keeping in mind that

the custody determination is based 'on the objective circumstances of the interrogation, not on

the subjective views harbored by either the interrogating officers or the person being

questioned.'"  LeBrun, 363 F.3d at 720 (quoting <u>Stansbury v. California</u>, 511 U.S. 318, 322-34

(1994)).

Based on the totality of the circumstances, the Court concludes that Medearis was not in

"custody" within the meaning of <u>Miranda</u> when initially questioned outside the house.  Several

factors support this conclusion.  Medearis was not handcuffed or physically restrained during this

encounter with tribal officers, but rather in his own vehicle.  He spoke freely with officers and

responded to their questions.  His colloquies were of a very short duration and no strong-arm

tactics or deceptive stratagems were employed to get him to talk.  The atmosphere of the

interchanges with officers was not police-dominated.  Significantly, he was not placed under

arrest upon termination of the questioning, but rather, only after Agent Ginsbach located the

missing windshield.

Taking into account all of the circumstances present, a reasonable person in Medearis's situation would not have understood that he was in custody during the initial brief conversation outside with federal officers. The officers, therefore, were not required prior to talking to Medearis to warn him of his Fifth Amendment privilege against self-incrimination and right to the assistance of counsel as required by <u>Miranda</u>. The officers did not violate Medearis's <u>Miranda</u> rights when questioning him outside the house.

**b. Statements Made Inside the House**

The interrogation inside the house, however, created a much different environment. Before proceeding through the custody analysis, it first must be addressed whether a Fourth Amendment violation occurred when the police entered the house to freeze the situation and secure the premises to prevent further suspected spoliation of evidence. No such violation occurred. As the Supreme Court of the United States has held, "where officers, having probable cause, enter premises, and with probable cause, arrest the occupants who have legitimate possessory interests in [the property's] contents and take them into custody and, for no more than the period here involved, secure the premises from within to preserve the status quo while others, in good faith, are in the process of obtaining a warrant, they do not violate the Fourth Amendment's proscription against unreasonable seizures." <u>Segura v. United States</u>, 104 S. Ct. 3380, 3382-83 (1984).

Whether a <u>Miranda</u> violation occurred inside the kitchen of the house is a different

-24-

matter.  Based on the totality of the circumstances, this Court concludes that a Miranda violation

did occur.  Upon the officers entering the house and freezing the situation, Medearis was in

custody for Miranda purposes.  Medearis was deprived of his freedom to leave the house.  This

was a restraint on his freedom of movement.  The circumstances surrounding the interrogation

were as follows:  Three officers, following instructions from Agent Ginsbach, entered the house,

secured the premises, and confined its three occupants, including Medearis, to the kitchen.  T.

47.  Agent Ginsbach subsequently entered the house and, without advising Medearis of his

Miranda rights, asked for the location of the windshield.  T. 51.

Given the circumstances, despite the fact that Medearis was not handcuffed or physically

restrained, a reasonable person would not have felt at liberty to terminate the questioning and

leave the kitchen, much less the house.  The atmosphere of the interrogation was police-

dominated, with four officers in the kitchen.  Thus, Medearis's statements inside the house were

taken while in "custody" for purposes of Miranda.  Because the questioning regarding the

location of the windshield was likely to elicit an incriminating response - as the windshield was

the focus of the investigation into suspected tampering with a witness and driving under the

influence and forms the basis of the tampering with evidence charge pending in this case -

Medearis also was "interrogated" for purposes of Miranda.  See Griffin, 922 F.2d at 1347; see

also Head, 407 F.3d at 928.  Therefore, statements made by Medearis inside the house were

taken in violation of Miranda and shall be suppressed.

Medearis also moved for suppression of his statements because they were the "tainted fruit" of a Fourth Amendment violation.  The Magistrate Judge recommended denial of this motion based on the application of the <u>Leon</u> good-faith exception to the Exclusionary Rule. Medearis objected to this recommendation, arguing that under the Exclusionary Rule, any statements obtained during an illegal search must be suppressed under <u>Wong Sun v. United States</u>, 371 U.S. 471 (1963), and that the statements made inside Medearis's residence must be suppressed under <u>Payton v. New York</u>, 445 U.S. 573.  Because of the <u>Miranda</u> violation inside the house, the Court suppresses the statements made inside the house.  However, the physical evidence need not be suppressed, as its recovery did not constitute a Fourth Amendment violation based on application of the <u>Leon</u> good-faith exception.

In addition, the <u>Miranda</u> violation inside the house does not merit suppression of the physical evidence recovered outside the house, because such evidence would have been inevitably discovered regardless of the <u>Miranda</u> violation.  <u>See</u> <u>Nix v. Williams</u>, 467 U.S. 431, 441 (1984) (adopting the inevitable discovery exception to the Exclusionary Rule); <u>see also</u> <u>United States v. Garreau</u>, No. 10-30014-RAL, 2010 U.S. Dist. LEXIS 85674, at *20-22 (D.S.D. 2010).  Otherwise unconstitutionally found evidence "need not be suppressed if the two prongs of the inevitable discovery doctrine are proved by a preponderance of the evidence:  (1) there is a reasonable probability the evidence would have been discovered by lawful means in the absence of police misconduct, and (2) the government was actively pursuing a substantial,

alternative line of investigation at the time of the constitutional violation." United States v. Munoz, 590 F.3d 916, 923 (8th Cir. 2010) (citing United States v. Thomas, 524 F.3d 855, 858 (8th Cir. 2008)); see also Nix, 467 U.S. at 444 & 448 (1984). The second prong "requires that the government prove that there was, at the time of the search . . . an actual other investigation that would have led to discovery of the otherwise unconstitutionally obtained evidence. Id. at 923-24 (quoting United States v. James, 353 F.3d 606, 617 (8th Cir. 2003)). The prosecution must establish "by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means." Nix, 467 U.S. at 444.

Both prongs of the inevitable discovery doctrine are met in this case. When questioning Medearis inside the house, Agent Ginsbach was relying in good faith on Judge Sully's authorization of a telephonic search warrant for the vehicle. The vehicle's windshield ultimately was found on the premises through pursuit of that alternate line of investigation. Medearis's statements obtained in violation of Miranda - a reiteration of a prior, legally obtained statement that he had sold the windshield - did not assist any of the officers in locating any of the physical evidence at issue. The glass shards, hammer and pick ax all were located prior to the statements made inside the house, and the windshield ultimately was found in an old truck bed elsewhere on the property and had not been sold.

### 3. February 3, 2010 Statements

Medearis also moved to suppress his February 3, 2010 statements on the grounds that

they were the fruit of an illegal search and questioning that occurred on February 2, 2010, contending under Wong Sun that illegality flowing from February 2, 2010 events tainted, thereby rendering inadmissible the February 3, 2010 statements.  The February 3, 2010 statements to Agent Ginsbach and FBI Agent Keith were made at Medearis's residence following Medearis's release from tribal custody on the tampering charge.

Medearis's argument is unavailing.  This Court already has determined that the search did not violate the Fourth Amendment, so the search was not a poisonous tree from which any poisonous fruit could fall.  Hessman, 369 F.3d at 1023-24.  Nor were the February 3, 2010 statements poisonous fruit from the Miranda violation inside the house on February 2, 2010.  On February 3, 2010, Medearis was not in custody but rather freely at home.  One "important factor" - though not dispositive - is that Medearis would have been advised of his Miranda rights on February 2, 2010 following his arrest.  United States v. Ramos, 42 F.3d 1160, 1164 (quoting Brown v. Illinois, 422 U.S. 590, 603-04 (8th Cir. 1975)).  The next day, Medearis voluntarily approached the agents, asked questions, and made comments.  These voluntary statements were not the product of any unlawful interrogation.  Rather, under the circumstances, the February 3, 2010 statements were "sufficiently an act of free will to purge the primary taint."  Ramos, 42 F.3d at 1164 (quoting Wong Sun, 371 U.S. at 486).

## IV.  CONCLUSION

For the foregoing reasons, it is hereby

-28-

ORDERED that Defendant's Motion to Suppress (Doc. 16) is denied in part and granted in part. The motion is granted with respect to Defendant's statements made on February 2, 2010, inside his house, as officers attempted to freeze the situation and secure the premises to prevent suspected tampering with evidence. The motion is otherwise denied. It is further

ORDERED that Defendant's Objections (Doc. 35) to the Report and Recommendation are overruled in part and sustained in part. The objections are sustained with respect to Defendant's statements made on February 2, 2010, inside his house, as officers attempted to freeze the situation and secure the premises to prevent suspected tampering with evidence. Those statements are hereby suppressed. Defendant's objections are otherwise overruled. It is further

ORDERED that the Report and Recommendation (Doc. 30) is adopted in part and declined in part. The Report and Recommendation is declined insofar as it recommended that this Court find that the Defendant's statements made on February 2, 2010 - inside his house, as officers attempted to freeze the situation and secure the premises to prevent suspected tampering with evidence - were not obtained in violation of Miranda v. Arizona.

Dated January 13, 2011.

BY THE COURT:

/s/ Roberto A. Lange
ROBERTO A. LANGE
UNITED STATES DISTRICT JUDGE

-29-